Exhibit G

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 915-CV-80665-DDM


EMILY SCHWEITZER,

     Plaintiff,

vs.

COMENITY BANK,

     Defendant.
_____/




CORRECTED

VIDEOTAPED DEPOSITION OF DANIEL GERVAIS

SEPTEMBER 25, 2015
8:56 A.M.

222 EAST TOWN STREET
2ND FLOOR
COLUMBUS, OHIO




REPORTED BY:
EBONY REYNOLDS
NOTARY PUBLIC, IN AND FOR THE STATE OF OHIO



877.291.3376
www.UCRinc.com

1    let me make sure that my question is clear.

2            Have you given any deposition testimony, in

3    any case that in any way involves the TCPA, whether

4    individually or on behalf of the corporate entity other

5    than the two times in the Couser case?

6        A.   No.

7        Q.   And just for the record, that's spelled, C-o -

8    - and I mispronounced it.  It's probably Cos -- Couser,

9    C-o-u-s-e-r, Carrie Couser.

10            MR. WITES:  How -- can we have an agreement

11        -- subject to the approval of your lawyers, of

12        course, that I may refer to your employer and who

13        you're testifying on behalf of today that we will

14        just call it Comenity.

15            MR. GOLDEN:  That's fine.

16            MR. WITES:  Okay.

17        Q.   So how -- and just so you understand if I ask

18    the next question which is, how long have you been

19    employed by Comenity?  We're talking about all of the

20    related entities whether it's Alliance Data, Comenity

21    Bank, Comenity Servicing, anything that involves a

22    Comenity or Alliance Data entity.  Okay?

23        A.   Understood.

24        Q.   Okay.  So how long have you been employed by

25    Comenity?



877.291.3376
www.UCRinc.com

1        A.   Almost 15 years.

2        Q.   **How long have you hold -- held your current**

3   **position?**

4        A.   The title Senior Strategy Analyst Manager for

5   two years.

6        Q.   **Have you been performing part or all of the**

7   **job duties of that role for longer than two years?**

8        A.   Yes, sir.

9        Q.   **For how long?**

10       A.   Approximately eight years.

11       Q.   **And what are your job duties in the role that**

12  **you presently have and have performed for the past eight**

13  **years?**

14       A.   I'm responsible for the collection and

15  recovery strategies for Comenity, and which involves

16  designing collection strategies, implementing them,

17  designing collection staffing strategies, and it also

18  includes designing dialer campaigns, and at one point I

19  managed the team that actually design -- build -- built

20  the dialer campaigns, managed them, pasted them, et

21  cetera.

22       Q.   **Uh-huh.  Now, you've used the term "collection**

23  **and recovery strategies."  Are you using that term in**

24  **the context of the business strategies as they're**

25  **implemented by people or are you referring in part or in**



877.291.3376
www.UCRinc.com

```
 1   of that, 5.1 and 5.2 but --
 2        Q.   Does Comenity always stay current with the
 3   newest releases of Avaya?
 4        A.   We don't always have the most recent release -
 5   - release, no.
 6        Q.   Okay.  So as we sit here today, does Comenity
 7   have the newest release?
 8        A.   No, sir.
 9        Q.   Do you know what version of Avaya Comenity was
10   using in 2013?
11        A.   Yes, sir, it was 5.
12        Q.   Okay.  What about in 2014?
13        A.   My understanding goes just -- I know 5. Avaya
14   version 5 and then there's several releases after that.
15   I don't know any more details.
16        Q.   Okay.  So in regard to the releases after
17   that, are you saying that Comenity never upgraded to or
18   purchased any of the subsequent releases?
19        A.   No, sir.  I'm just saying that I don't know
20   the exact version number that we're on within Avaya 5.
21        Q.   Within Avaya 5?
22        A.   Correct.
23        Q.   So and I'm not -- I just want to make sure we
24   covered it.  Forgive me if it seems like I'm asking the
25   same question, again, but in regard Avaya version 5, do
```



877.291.3376
www.UCRinc.com

```
1    you know if it's 5.1 or 5.4 or it has a specific date
2    attached to it?
3         A.   I do not know for sure.
4         Q.   Are there any aspects of Avaya version 5 that
5    Comenity does not have?
6         A.   Yes, sir.
7         Q.   Okay.  So what -- what -- what aspects or
8    modules of Avaya version 5 does Comenity not have?
9         A.   There's one -- the main version that I know we
10   don't -- do not have yet and it's simply a -- on Avaya
11   version 5, we went to being able to place multi -- group
12   multiple dialers together.
13        Q.   Huh-uh.
14        A.   So there's a current limit to that right now,
15   five dialers that you can group together.
16        Q.   Okay.
17        A.   And I there -- I know -- I'm aware that
18   there's a newer version of Avaya that will allow you to
19   go up to ten, and we do not have that version.
20        Q.   Okay.
21        A.   I don't know the exact version number.
22        Q.   But with the exception of the version that
23   allows more than five dialers, Comenity has all of the
24   modules and components of Avaya 5?
25        A.   That's my understanding, yes.
```



1      Q.    And for how long well-- strike that.  In

2   regards to the ability to use five dialers has that been

3   true during the five and maybe eight-year period that

4   you described?

5      A.    No, sir.

6      Q.    When did Comenity upgrade to the version of

7   Avaya or the module of Avaya that would allow the use or

8   the simultaneous use of five dialers?

9      A.    September 2012.

10      Q.    And what type of -- so just for purposes of

11   the record, what is a dialer?

12      A.    The dialers -- our dialers are predicted

13   dialing systems which allows us to load to them our --

14   our customer, our delinquent population, we then use

15   those dialers to design campaigns to launch phone calls

16   for us, at a -- you know higher rate than manually a

17   dialer, and then those -- those -- the dialers launches

18   the phone calls, and then it reaches the customer, and

19   then directs that call to a collector.

20      Q.    Okay.  So when you say that the -- what's the

21   name of the dialer?

22      A.    Avaya.

23      Q.    Avaya.  So Avaya is both the software and the

24   hardware that performs the dialer function?

25      A.    Yes, sir.



877.291.3376
www.UCRinc.com

1      Q.   Is it a PBX system?

2      A.   I don't believe it is.  I feel like it's a

3  dialer.  My understanding is the dialer connects to the

4  PBX system.

5      Q.   Okay.  So what is the PBX system that the

6  dialer connects to?

7      A.   We also use Avaya for our telephone meetings.

8      Q.   Okay.  So what's the name -- do you know the

9  name of the Avaya PBX dialer that Comenity uses?

10     A.   As it relates to dialers, my only

11  understanding is Avaya 5.

12     Q.   So when you said that Avaya loads delinquent

13  customers, are they loaded into a database?

14     A.   Yes, sir.

15     Q.   Okay.  And so the database would contain a

16  list of certain characteristics of customers of Comenity

17  who are delinquent on their account?

18     A.   Yes.

19     Q.   And by delinquent, we mean people who are

20  behind by some degree of time and money on a payment due

21  on their credit card?

22     A.   Yes, sir.

23     Q.   And what information is contained in the

24  database tables for these customers?

25     A.   It's a very large database, I would not be



877.291.3376
www.UCRinc.com

1  able to cite all of them.

2      Q.    Okay.

3      A.    But name, address, telephone numbers

4  associated with the account, their balance, how many

5  payments they're behind, there'll also be fields in

6  there that describe the collection queues that they are

7  currently in.

8      Q.    Right.

9      A.    Some scoring, some scores are loaded into this

10  field as well, statistics around how many cap -- times

11  the account has been called within cycle when giving, I

12  think, statistic how many calls on any given day.

13      Q.    So -- so we can say at a minimum that the

14  tables contain a list of the name, address, phone number

15  of customers of Comenity who are delinquent on their

16  account?

17      A.    Yes, sir.

18      Q.    Okay.  And then the -- from that list the

19  dialer launches phone calls based on the matter in which

20  the Avaya system is programed or set up by Comenity,

21  correct?

22      A.    Yes, sir.

23      Q.    Okay.  And how were those numbers pulled out

24  of the database for -- for -- for input into a dialer?

25      A.    We'll select based on their -- how many



```
 1   payments behind and their balance, and which -- which

 2   accounts were called, phone numbers were called that

 3   day.

 4        Q.   Okay.  How many phone numbers?  Was there a

 5   setting for the number of calls that are made in a day?

 6        A.   I'm sorry.  I don't understand.

 7        Q.   Well, as I understand your testimony, there's

 8   certain characteristics that you or -- I want to ask you

 9   a question.  Is it -- were you involved in whole or in

10   part in determining the characteristics that would be

11   used to determine which delinquent customers are called

12   on a given day?

13        A.   Yes, sir.

14        Q.   Okay.  And as part of those characteristics is

15   there a minimum or maximum number of phone calls that

16   are made by the dialer on a given day?

17        A.   Yes.

18        Q.   Okay.  What's the minimum?

19        A.   We don't set -- we don't set a minimum.

20        Q.   Okay.

21        A.   But there are maximum rules that we do apply.

22        Q.   Why would you apply maximum?

23        A.   Because we don't want to call a customer

24   record more than say, six or eight times in a given day.

25        Q.   So the system does allow for the same customer
```



1  to be called up to six to eight times on a given day?

2      A.   Yes, sir.

3      Q.   And why is that?

4      A.   Are you -- is it -- is the question why does

5  the system allow it?

6      Q.   No.  Why was the system programmed to allow

7  it?

8      A.   We will -- we will allow, you know, we want to

9  make multiple phone calls to the customer on that given

10  day.

11      Q.   Because you want to get the customer on the

12  phone?

13      A.   Yes, sir.

14      Q.   Okay.  And does the Avaya system have the

15  ability to limit the number of calls per day to one call

16  per day?

17      A.   Yes.

18      Q.   Can you limit the number of calls to three

19  calls per day?

20      A.   Yes, sir.

21      Q.   What's the largest number of calls the system

22  will allow per day?

23      A.   I do not know.

24      Q.   Okay.  Do you know if it goes beyond the

25  setting that Comenity is presently using, I believe you



1    said 8 calls a day?

2         A.   Yes, sir.

3         Q.   Okay.  So, yes, it does allow more than eight

4    calls a day?

5         A.   Yes.

6         Q.   How did Comenity come to the decision to limit

7    the number of calls per day to eight?

8         A.   Customer experience.  We don't want to over

9    call a customer on a given day.

10        Q.   Right.  So Comenity's position is that up to

11   eight calls is not overcalling or too many for one day?

12             MR. GOLDEN:  Form.

13        Q.   You can answer the question.

14        A.   Yes, sir.

15        Q.   And let's say that there are, you know, on a -

16   - on a given day that there's -- well let me ask -- let

17   me ask you a better question actually. I'm trying to ask

18   you a better question.  So approximately how many calls

19   does the system make on a given day?  Again, we're

20   talking about outbound calls using a dialer for

21   collection purposes.

22        A.   The dialer makes approximately a million and

23   half phone calls a day.

24        Q.   Okay.  And of those million and a half phone

25   calls a day how many of them result in an actual of --

```
1              MR. GOLDEN:  Yeah.  We can take a short break.
2         That's fine.
3              (A short recess was taken.)
4              VIDEOGRAPHER:  The time is approximately 9 --
5         9:46 and we are back on the record.
6         Q.   Have you reviewed the -- the call detailed
7    report that lists the calls at issue in this lawsuit
8    that were made by Comenity to the Plaintiff, Emily
9    Schweitzer?
10        A.   No, sir.
11        Q.   Have you reviewed any physical or electronic
12   file or record that relates to the phone calls made by
13   Comenity to Emily Schweitzer?
14        A.   No, sir.
15        Q.   Do you know anything about the phone calls
16   made by Comenity to Emily Schweitzer?
17        A.   In terms of phone calls you mean the number of
18   phone calls or -- what would you like?  -- the result of
19   the phone calls.
20        Q.   Well -- let's -- you can break it down. We'll
21   start with the number of phone calls.  Do you know the
22   number of phone calls?
23        A.   No, sir.
24        Q.   Do you know when the calls were made?
25        A.   No, sir.
```



1      Q.   Do you know how the calls were made?

2      A.   Yes.

3      Q.   Okay.  How were the calls made?

4      A.   They were made via our dialer.

5      Q.   Okay.  And when you say "our dialer," which

6   dialer are you referring to?

7      A.   The Avaya dialer.

8      Q.   Do you know why the calls were made?

9      A.   The customer's account fell into delinquency,

10   our collection queues to be called.

11      Q.   Do -- is there any difference to your

12   knowledge between the manner in which Comenity placed

13   the calls to the Plaintiff, Emily Schweitzer, in this

14   case, in the manner in which Comenity placed calls to

15   class members in Carrie Couser case?

16          MR. GOLDEN:  Form.

17      A.   I am not aware of any -- no difference.

18          (EXHIBIT MARKED FOR IDENTIFICATION.)

19      Q.   And are you -- let me show you a document that

20   we?ll mark as Plaintiff's Exhibit No. 2.

21          MR. WITES:  Let me just make sure I'm giving a

22      copy to Dan -- excuse me Dale as well. Here.

23      There.

24      Q.   Have you ever seen the document that we've

25   marked as Plaintiff's Exhibit No. 2?



877.291.3376
www.UCRinc.com

```
 1        A.   No, sir.
 2        Q.   Do you know whether or not Comenity Bank has
 3   stipulated for the purposes of this case, that the phone
 4   calls that it placed to the Plaintiff, Emily Schweitzer,
 5   were made using equipment that falls within the purview
 6   of TCPA?
 7        A.   Yes, sir.
 8        Q.   Yes, sir, you understand that to be true?
 9        A.   Yes.
10        Q.   And what's your understanding of the term
11   "purview"?
12             MR. GOLDEN:  Form.
13        A.   I would -- I would -- purview would be on the
14   scope of TCPA.
15        Q.   Okay.  So that would mean scope or falls
16   under?
17        A.   Yes, sir.
18        Q.   Okay.  So for purposes of the phone calls at
19   issue in this case that the -- that Comenity placed to
20   the Plaintiff, Comenity has stipulated that the calls
21   that were made were made with an automated dialer as
22   defined by the TCPA, itself, and the FCC regulations
23   that govern it, correct?
24             MR. GOLDEN:  Form.
25        A.   Yes, sir.
```



```
1        Q.   And is it also your understanding that

2   Comenity has stipulated in this case that it knew that

3   at the time those calls were placed that the equipment

4   that it was using failed within the purview of the TCPA?

5        A.   Yes, sir.

6        Q.   And is it also correct that at the time that

7   the calls were made Comenity Bank was aware that they

8   were making phone calls to the Plaintiff, Emily

9   Schweitzer, at a phone number she provided when she

10  opened the account?

11       A.   Yes, sir.

12       Q.   What -- what is your understanding of why --

13  the -- the dialer and the related equipment used by

14  Comenity Bank falls within the purview of the TCPA?

15            MR. GOLDEN:  Form.

16       A.   It's my understanding it falls under the TCPA

17  because our dialers -- especially as it relates to the

18  latest FCC ruling that our dialers would fall under --

19  they have a potential capacity, you know, to

20  automatically dial customers.

21       Q.   Okay.  And they've had that potential capacity

22  for at least the past three or four years, correct?

23            MR. GOLDEN:  Form.

24       Q.   Your answer was "yes"?

25       A.   Yes.
```



1      Q.   And when -- when we use -- have used the term

2   these past few questions "TCPA," do you understand

3   that's the name of the Telephone Consumer Protection

4   Act?

5      A.   Yes, sir.

6           (EXHIBIT MARKED FOR IDENTIFICATION.)

7      Q.   I'm going to show you a document that we will

8   mark as Exhibit 3, and these are -- this is a report

9   that was produced to be my -- for to -- produced to me

10   by Comenity.

11           My first question is, have you ever seen this

12   specific report before?

13      A.   No, sir.

14      Q.   Have you ever seen a report, in connection

15   with your job at Comenity that would contain information

16   similar to the report that we marked as Exhibit 3?

17      A.   Yes, sir.

18      Q.   Is there a name for this report?

19      A.   You know, dialer activity report.

20      Q.   Okay.  Going across the column headers from

21   left to right.  I assume "Account No." references the

22   account number assigned to the customer of Comenity?

23      A.   Yes, sir.

24      Q.   And that -- another way to describe that

25   person will be the credit cardholder?



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    A.   Yes, sir.

2        Q.   Okay.  Is there a -- a term or entry that the

3    outbound agent can make in this field when the customer

4    instructs or asked that they no longer be called?

5        A.   Not on the -- there's not -- no.

6        Q.   Okay.  Is there some other field or place in

7    any of Comenity's system where the outbound agent could

8    input information to indicate that the -- the customer

9    asked that they no longer be called?

10       A.   Yes, sir.

11       Q.   And where's that?

12       A.   It will be on Collection Web, they would

13   update the phone validity code associated with the phone

14   number dialer.

15       Q.   And if the outbound agent updates the phone

16   validity code or -- code what are the possible entries

17   that the outbound agent can make to indicate that

18   customer has requested that they no longer be called?

19       A.   If the customer requested to no longer call

20   them, they would update the validity code with an N.

21       Q.   An N.  Now, if the outbound agent inputs the

22   N, does that automatically result in the system ceasing

23   all phone calls to that number or does something else

24   have to happen?  In other words, does another person

25   have to make another adjustment or entry in the system



1   or does the system have to do something else in order

2   for the system to no longer put that phone number in to

3   the queues to make outbound -- outbound dialer calls to

4   that person.

5       A.    The customer -- the agent, the collector will

6   terminate phone call as a refusal which would --

7   actually let me take that back.  I mean, it is possible

8   for a customer to say -- to make a promise to us and

9   also ask us that -- that same day to no longer call

10  them.  So those termination codes will keep the promise

11  -- if they got a promise to put out on that call or the

12  most common would be probably refusal to take it would

13  keep the account from being called for the rest of the

14  day on the dialer side. And, then, the fact that the

15  customer -- or -- I apologize -- the agent updated the

16  phone validity code with an N that would keep that phone

17  number from ever being presented to the dialer again

18  because each night the dialer is -- there's -- there's

19  processes that run that fills the database of the

20  accounts to be called and if the phone number has a N

21  validity code that's not related to the dialer.

22      Q.    Okay.  So, in other words, it will be up to

23  the agent to input the code in -- in the phone validity

24  field in order for the dialer to then know that no phone

25  calls could then be initiated to that phone number; is



1    that correct?

2         A.   That is correct.

3         Q.   And if a customer were to tell -- well, let me

4    back up.  Does the outbound agent have any discretion in

5    choosing to enter or not enter the N in the phone

6    validity code?

7              MR. GOLDEN:  Form.

8         A.   No.  If the -- if the customer told them to no

9    longer call them, it's our procedure that they are to

10   document that phone validity code with an N.

11        Q.   Okay.  And is that procedure set forth in any

12   particular document?

13        A.   Yes, sir.

14        Q.   What's the name of that document?

15        A.   Ooh, umm, I wouldn't know the exact name, but

16   it would be a document describing on how we managed our

17   phone validity codes.

18        Q.   And is that a document that would be part of

19   the dialer support team library?

20        A.   No, sir.  That -- that will be documents for

21   our collector -- our collector training.

22        Q.   And is that a document that the outbound

23   agents have access to while they are performing their

24   job duties?

25        A.   Yes.



877.291.3376
www.UCRinc.com

1    Q.   And that's also a document that's used in

2    training the agents before they are allowed -- excuse me

3    -- to -- to start work as an agent?

4    A.   Yes.

5    Q.   Now, you had talked about -- I'm not sure what

6    you were referring to, so I'm just going to say that you

7    used the word "refusal" and you -- as I understood it

8    that was something that was distinguishable from an N

9    being entered in the phone validity code or the phone

10   validity -- is it the validity field, is that more

11   accurate?

12   A.   Yes, sir.

13   Q.   Okay.  So it relates to refusal what does that

14   mean?  What did you mean by that?

15   A.   Refusal is what we referred to as a -- we

16   spoke to the customer and weren't able to setup payment

17   arrangements.

18   Q.   Okay.  And that would be something different

19   than the customer's saying don't call me anymore?

20   A.   Yes, sir.

21   Q.   So if the customer says or refuses to make a

22   payment and is the agent then based on the policies and

23   procedures supposed to enter refusal of the description

24   code?

25   A.   Which description code?



1    Q.   Well, you tell me, please, because not -- I'm

2    trying to understand what you mean by that term or what

3    Comenity means by that term, where it's entered in the

4    system, how it's entered in the system and what the

5    result is.

6        A.   The collector will -- will -- will terminate

7    the phone call on the dialer as a refusal.

8        Q.   Okay.  And then would the term "refusal" if

9    -- if that were to occur show up in the description

10   column of the report that's been marked as Exhibit 3?

11       A.   Yes.

12       Q.   And if the term -- or if the entry of refusal

13   is entered in that field will the dialer initiate a

14   phone call to that person again that day?

15       A.   No.

16       Q.   Would it be possible for that customer's

17   number to end up in the queue again the next day?

18       A.   No, sir.

19       Q.   Okay.  If the agent entered refusal in the

20   description code is the -- does the dialer ever call

21   that number again?

22            MR. GOLDEN:  Form.

23       A.   Yes.

24       Q.   Okay.  After how much time -- strike that.

25   What -- how is the Comenity's system set up to determine



1   how much time must pass until Comenity places a call

2   using its dialer again to a person for whom a refusal

3   was entered?

4            MR. GOLDEN:  Form.

5       A.   If we get a refusal, we will not dial that

6   number again for five days.

7       Q.   Okay.  So the Avaya system is set up so that

8   if the customer refuses to make a payment and the agent

9   enters a refusal under the description field, it -- the

10  system will keep that customer's phone number out of

11  queue for five days?

12      A.   Yes, sir.  And I missed -- just to clarify. I

13  misspoke a little.  It doesn't keep that phone number

14  from being called, it keeps that customer's account from

15  being called --

16      Q.   Okay.

17      A.   -- which includes all phone numbers on the

18  account.

19      Q.   So all collection activities would stop for

20  that customer for a period of five days?

21           MR. GOLDEN:  Form.

22      A.   Not all activities.

23      Q.   Okay.  All -- is it fair to say that all phone

24  calls using the dialer would stop for a what's the of

25  five days?



877.291.3376
www.UCRinc.com

```
1        A.    Yes.

2              MR. GOLDEN:   Form.

3        Q.    Is it five business days or five calenders

4   days?

5        A.    Five calenders days.

6        Q.    Does Comenity make outbound calls using the

7   dialer for purposes of collections on Saturdays and

8   Sundays?

9        A.    Yes, sir.

10       Q.    And during what hours during weekdays does

11  Comenity make calls using the dialer for collection

12  purposes?

13            And let's use it -- to make the question

14  perhaps a little bit easier and more specific in the

15  Eastern time zone?

16       A.    In the Eastern time zone from 8:00 a.m. to

17  9:00 p.m.

18       Q.    Okay.  And is that true for Monday through

19  Sunday or just for weekdays?

20       A.    Can you -- actually prior -- prior entered

21  it's actually -- we're dialing from 8:00 a.m. to 11:00

22  p.m. during the weekdays.

23       Q.    Okay.

24       A.    But we only dial to the customer from 8:00

25  a.m. to 9:00 p.m. their time.
```



1      Q.    Okay.  And how is that there's that two-hour

2    gap at the end from 9:00 p.m. to 11:00 p.m.

3            where the dialers is still dialing, but the

4    customer couldn't receive your call?

5            MR. GOLDEN:   Form.

6      A.    During that time is it -- my answer would be

7    in Eastern Standard Time we would be calling times, you

8    know, customers who are in specific times zone --

9      Q.    I understand.  So the dialer is only

10   initiating calls to customers in the Eastern time zone

11   between the hours of 8:00 a.m. and 9:00 p.m.?

12     A.    Yes, sir.

13     Q.    And is that true during the week?

14     A.    Yes.

15     Q.    And is it also true on the weekends?

16     A.    We close at -- at 5:00 p.m. on the weekends

17   and it's -- the exact it -- it's approximately 8:00

18   o'clock on Saturday.  I'm not a hundred percent sure

19   it's on -- it's within that hour, you know, hour or two

20   of 8:00 o'clock.

21     Q.    I'm not sure that I understood your answer

22   there.  You said that you closed at 5:00 p.m., but than

23   you talked about 8:00 o'clock.

24     A.    Yeah.  I apologize.  I was talking about on

25   Sundays.



1    Q.    Okay.

2    A.    And on Saturdays we dial to 8:00 o'clock.

3    Q.    Okay.  When the -- when the letter N is

4  entered in the phone validity field -- and let me make

5  sure I'm using a better term.  When I say, "the letter

6  N", is that a -- you used -- or do you understand that

7  to mean that the code is N, a code?

8    A.    Yes.

9    Q.    Okay.  So when N is entered into the phone

10  validity field, you testified that that's an entry is

11  made when the customer has requested that they no longer

12  be called at that number, correct?

13    A.    Correct.

14    Q.    And does that result in the dialer no longer

15  calling the customer at that specific phone number or is

16  it at any phone number that has been provided by the

17  customer?

18    A.    At that specific phone number.

19    Q.    Okay.  And does -- does anything else happen

20  as a result of the agent entering an N when a customer

21  says don't call me any more?

22         MR. GOLDEN:  Form.

23    A.    No, sir.

24    Q.    Okay.  So for example does the -- are any

25  Comenity's systems generate a report as a result of a


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1   result of an outbound agent having entered an N in the

2   phone validity field?

3        A.   No, sir.

4        Q.   Does the system send notification of any kind,

5   whether it be by e-mail or pop up or text message or any

6   other median to anybody within Comenity, when a customer

7   says don't call me any more and the agent enters an N?

8        A.   No, sir.

9        Q.   Does the entry of the N in the phone validity

10  field result in the customer's account being closed?

11       A.   No.

12       Q.   What other -- does Comenity continue to engage

13  in collection activities as to a customer who has

14  requested that they no longer be called where the agent

15  has entered N in the phone validity field?

16           MR. GOLDEN:   Form.

17       A.   If the customer requested to be -- no longer

18  be called at that specific phone number, we would still

19  dial other phone numbers on that account --

20       Q.   Okay.

21       A.   -- related to the customer, and we would still

22  send them letters or e-mails and possibly text messages

23  --

24       Q.   Okay.

25       A.   -- on a different phone number other than the



1   one they said to no longer call them on.

2       Q.   Right.  So if the customer has only one phone

3   number and the customer has said don't call me any more

4   and the agent has entered N in the phone validity field

5   you would agree that it's still possible for Comenity to

6   engage in other collection activities as it relates to

7   that customer provided that their account is or becomes

8   again delinquent.

9            MR. GOLDEN:  Form.

10      A.   And your question, if they said do not call me

11  any more period, there would be a different reaction

12  from us.  If they say do not call me any longer at this

13  specific phone number that doesn't mean we will just

14  stop trying to collect upon them. We will stop calling

15  them on that specific phone number.

16      Q.   Okay.  So, if they say do not call me any more

17  period, you said there's a different reaction that

18  happens?

19      A.   Yes, sir.

20      Q.   What do you mean by that?

21      A.   So we will take, you know, if the customer

22  says, you know, do not call my any more period.  We will

23  N out all phone numbers on the account, and we will stop

24  placing phone calls to any number for that customer.

25      Q.   So when you?re -- the way you're



1    distinguishing these two possibilities is one, is don't

2    call me anymore at the specific phone number, and one,

3    don't call me anymore at any phone number?

4        A.   Yes, sir.

5        Q.   Okay.  And is there a different code that's

6    entered for one versus the other?

7        A.   No.

8        Q.   So they both get the N in the phone validity

9    field, correct?

10       A.   Yes, sir.

11       Q.   The difference would be that the N would be

12   assigned to all of the fields that we had talked about

13   earlier that are listed on Exhibit 3 and the P_Fieldnum

14   column as opposed to just one; is that correct?

15       A.   That's correct.

16       Q.   So if a customer says don't call me anymore

17   -- well -- strike that.  In the situation where the

18   customer says do not call me any more period, does

19   Comenity continue to engage in other collection

20   activities as it relates to that particular customer?

21           MR. GOLDEN:  Form.

22       A.   Yes.

23       Q.   Okay.  And an example would be an e-mail or--

24       A.   Or a letter.

25       Q.   -- or a letter?



```
1        A.    Yes.

2        Q.    Does Comenity ever engage in collection

3   activities by telephone through the use of manually

4   dialing the customer's phone number?

5        A.    Yes, sir.

6        Q.    Okay.  When does that occur?

7        A.    It occurs in our mid and late stage

8   collections and our post charge off collections.

9        Q.    Okay.  Why is manual dialing used in those

10   stages of collections?

11        A.    One, we want -- we want the collector to, you

12   know, pull up the account or review the notes on the

13   account to see what is going on.  So it's more of a

14   manual review of the account as a whole and while

15   they're doing that they will place manual phone calls.

16        Q.    Does that have anything to do with compliance

17   with the Telephone Consumer Protection Act?

18        A.    Yes, sir.

19        Q.    What does it have to do with compliance with

20   the TCPA?

21        A.    So if we -- know a phone number is no call, we

22   do not have consent to call it, we will place those

23   phone calls manually.

24        Q.    Okay.  So if the customer and we can use the

25   Plaintiff as an example or you can think of it as a
```

```
 1        A.   Yes.

 2        Q.   And how frequently does that occur?

 3        A.   It occurs on less than three percent of our

 4   volume.

 5        Q.   So less than two percent?

 6        A.   It -- it's varied over time, so approximately

 7   three percent.

 8        Q.   Huh-uh.  How low has it been?

 9        A.   Well, I -- I can't recall seeing it less than

10   two percent.

11        Q.   Huh-uh.  Have you ever listened to either a

12   live or in a recording a customer saying in form or in

13   substances, you can continue to call me on my cell phone

14   but don't call me using the automated dialer?

15        A.   Yes.

16        Q.   And they specifically -- did they specifically

17   used the words, you can -- "automated dialer"?

18        A.   An example I can think of that -- that they --

19   they used the term "dialer".

20        Q.   And in those particular situations, Comenity

21   will continue to call that person, but they'll do so

22   manually?

23        A.   Yes, sir.

24             VIDEOGRAPHER:  Sorry to interrupt.  I have to

25        change the tape.
```



```
 1              (A short recess was taken.)

 2              VIDEOGRAPHER:  The time is approximately 10:48

 3         and we are back on the record.

 4              MR. WITES:  Thank you.

 5         Q.   Do you have an understanding of what

 6    Comenity's position is as to how it obtains the express

 7    consent of its customers to place calls to them using

 8    automated dialer?

 9         A.   Yes, sir.

10         Q.   How does Comenity obtain such express consent?

11              MR. GOLDEN:  Form.

12         A.   A variety of ways.  The first being through

13    the application, the actual credit card application. If

14    they put the -- put it on there we have language on

15    there that gives us consent.  They can give us, their

16    consent when they provided us the phone number when we

17    are speaking with them either via a collection agent or

18    even an inbound customer service agent, if they call us

19    for any number of reasons. Again, provide us the phone

20    number through our IVR from the phone, I think that's

21    what its called.  They can also provide us their phone

22    number when they are managing their account online.

23         Q.   Okay.  So is it Comenity's position that the

24    providing of a cellular telephone number without more

25    provides the consent necessary under TCPA or Comenity
```



1    **will call that person using an automated dialer?**

2          MR. GOLDEN:   Form.

3          A.   Is the question just by simply giving us a

4    phone number is that --

5          **Q.   Yes.**

6          A.   My understanding is no because in all those

7    channels, we have a pop up or a script that we read to

8    them or it's in the agreement that has that language in

9    it.

10         **Q.   What language are you referring to?**

11         A.   I don't know the verbatim language, but it

12   kind of just says by providing us this number you -- you

13   know, consent to calls via automated dialer.

14         **Q.   So that's a necessary part of Comenity**

15   **obtaining consent from the customer to call them using**

16   **an automated dialer?**

17         MR. GOLDEN:   Form.

18         A.   In our procedures, yes.

19         **Q.   And are the -- is this the -- the substances**

20   **or the content of those pop ups or scripts that you**

21   **referred to contained in a document that Comenity has**

22   **within its possession or custody?**

23         A.   Yes, sir.

24         **Q.   Where are they contained?**

25         A.   They'll be contained in our collection



```
 1                    MR. GOLDEN:  Form.
 2          A.   I don't know the answer to that.
 3          Q.   Okay.  Well, based on your experience at
 4    Comenity, would you agree that -- strike that -- do --
 5    do you have a general understanding of whether Comenity
 6    sends to its customers the Credit Card Account Agreement
 7    that we have marked as Plaintiff's Exhibit 5?
 8          A.   Yes, that's my general understanding.
 9          Q.   So why would there be an occasion where an
10    outbound collection agent would need to obtain the
11    consent of a Comenity customer to call them using an
12    automated dialer?
13                    MR. GOLDEN:  Form.
14          A.   There will be a variety of reasons.  One,
15    often times the customer will just place their mobile
16    phone number as their home number on the application.
17    That's very, very common.  So it would be in that phone
18    field number one that we referred to earlier --
19          Q.   Huh-uh.
20          A.   -- and so then we talked to the customer, and,
21    then, they says oh, this is my cell phone, and, then, at
22    that point, you know, we still have collectors go
23    through the procedure of moving the phone number to the
24    mobile field and then reading them that script.
25          Q.   Okay.  What other circumstances could there
```



```
 1  be?
 2       A.   If we obtain the phone number through a third
 3  party search through skip tracing.  So any number we
 4  find via skip tracing we automatically put that A
 5  validity on it.  So if we call a customer by the number
 6  obtained and get them on the phone, during that phone
 7  call we will attempt to get consent to call them, and if
 8  they give us that consent then we will change the
 9  validity code to a V so nobody can use the dialer then.
10       Q.   Okay.  Are there any other circumstances?
11       A.   Those two are the -- really the main -- I
12  can't think of one off top of my head.
13       Q.   What if a Comenity customer has told Comenity
14  to stop calling them on their cell phone, and, then at
15  some point in the future Comenity asked them can we call
16  you on this number --
17            MR. GOLDEN:  Form.
18       Q.   -- would that be a circumstance where
19  Comenity's policies and training documents would provide
20  for the outbound agent to read the script again to
21  obtain that customer's consent to call them using the
22  automated dialer given that the customer had told
23  Comenity in the past don't call me using the automated
24  dialer?
25            MR. GOLDEN:  Form.
```



1        A.    That's -- that instance can happen that where

2   we contacted them on a separate phone number and as

3   they're updating their information, we may have asked

4   them that we see this phone number as -- you indicated

5   that's not a good number for you, is that still the

6   case?

7        **Q.    Okay.**

8        A.    And if they say it -- it's still the case, we

9   will keep it there, if they say, no, it's okay. There

10  are -- it does happen when the customer says, no, you

11  can call me at this phone number, and we will read the

12  script again, updated the phone validity, so V -- then

13  to the V, move forward.

14       **Q.    So the V code stands for what?**

15       A.    V means valid, and it can be -- we can't place

16  calls on -- via the dialer.

17       **Q.    So in a circumstance where the agent is**

18  **changing from an N or an A to a V Comenity's policy**

19  **would be for them to read the script that asks for the**

20  **customer to consent to receiving phone calls via**

21  **automated dialer on their cell phone?**

22            MR. GOLDEN:  Form.

23       A.    Yes.

24       **Q.    Is there a report that Comenity's systems have**

25  **the ability to generate that would reflect or contain**



1    credit balance of $15?

2         A.   That's what that indicates.

3         Q.   Is there something within Comenity's system

4    that causes it to initiate a refund to customers that

5    have a credit balance?

6         A.   Yes.

7         Q.   How does that occur?

8         A.   I don't -- I'm not a subject matter expert on

9    that.

10        Q.   Okay.  Are there any outbound phone calls

11   reflected on Exhibit 8 that were made to the Plaintiff

12   through the manual dialing of her telephone number?

13        A.   Yes.

14        Q.   Okay.  Where would that be reflected?

15        A.   It appears on 3/19/2015 at 9:35 -- 4 a.m., an

16   agent placed an outbound -- a manual call as indicated

17   by the OC action.

18        Q.   Okay.

19        A.   But this document will not be 100 percent

20   accurate as it's relates to those whether it's a dialer

21   or not, that's why we use the Exhibit 3 --

22        Q.   Okay.

23        A.   -- which has all the dialer's actual calls.

24   And the reason being was to just to doc through

25   collection -- collector documentation error.  They --



877.291.3376
www.UCRinc.com

```
 1        A.    Manual.

 2        Q.    Okay.  So going back to the March 19th of 2015

 3   call, I wanted to ask if you would -- if it's good

 4   enough to listen to it and I want to ask you a few

 5   questions.

 6        A.    Okay.

 7              "MS. SCHWEITZER:  Hello.

 8              RODRIGO:  Hi, may I speak with Emily

 9        Schweitzer.

10              MS. SCHWEITZER:  Hi.  Yes.  This is she. Can

11        you please stop calling me?

12              RODRIGO:  Hi, Miss Emily.  My name is Rodrigo,

13        and I'm -- first for quality purposes this maybe

14        monitored or recorded.  I'm calling from Comenity

15        Bank regarding your Victoria's Secret account.

16              MS. SCHWEITZER:  Huh-uh.

17              RODRIGO:  We're showing you're four months

18        behind and just calling to see if you want to set

19        up a payment of your balance of $190.

20              MS. SCHWEITZER:  Okay.  Please, can you -- can

21        you just please stop calling.  I'll appreciate it.

22        Thanks.

23              RODRIGO:  I just wanted to know if you can

24        make a payment on your account?"

25   BY MR. WITES:
```



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    Q.   My first question is, are you able to tell

2  from listening to that call whether or not it was

3  initiated via the automated outbound dialer or whether

4  it was made manually?

5    A.   I can't tell by listening to it.

6    Q.   Okay.  Second, based on the statements made by

7  the customer in that recording, would it have been

8  Comenity's policy or procedure for the collector to

9  place an A or a N in the phone validity field for this

10  customer?

11        MR. GOLDEN:  Form.

12    A.   It would have been our procedure to place an

13  N.

14    Q.   Okay.  And, again, the N stands for what?

15    A.   Do not call.

16    Q.   Okay.

17    A.   Okay.  It means -- it's -- it is a known

18  number owned by the customer, but do not call them on

19  that number.

20    Q.   And what is it about what the Plaintiff or

21  what the -- this recording happens to be of the

22  Plaintiff in this case, what is it about what she said

23  that causes you to reach that decision?

24        MR. GOLDEN:  Form.

25    A.   She asked to please stop calling her.



1      Q.    Okay.  And so those words were enough?  You

2   would agree that those --

3      A.    Yeah.

4      Q.    -- words were enough, yes?

5      A.    Yes.

6      Q.    Does Comenity's systems have the ability to

7   strip or set parameters for the times of day for the

8   days of the week that the outbound dialer will be

9   permitted to make calls to a specific customer.

10          MR. GOLDEN:  Form.

11     A.    I apologize.  Can you please repeat that?

12     Q.    Well, for example, let's say that a customer

13   said don't call me Monday through Friday from 9 to 5?

14     A.    Uh-huh.

15     Q.    Does Comenity have the ability -- strike that

16   -- do Comenity's systems have the ability to adjust the

17   settings so that the outbound dialer will not initiate a

18   phone call during the time period where the Plaintiff

19   said, don't call me?

20          MR. GOLDEN:  Form.

21     A.    So it's my understanding that we do not

22   currently have the abilities to do that.  It would

23   require development to do -- achieve that.

24     Q.    Uh-huh.  So, the software will be capable of

25   doing it, but they have to write an additional code or



1   script for it?

2       A.   That's my understanding.

3       Q.   Okay.  Has that been something that Comenity

4   has ever considered doing?

5       A.   Yes, sir.

6       Q.   Okay.  During what time period has Comenity

7   considered doing it?

8       A.   Over the last couple of years we've been

9   having some discussions of having that capability.

10      Q.   Uh-huh.  And, approximately how much time

11  would it require to write that code?

12      A.   I do not know.

13      Q.   Has the code been written?

14      A.   Not to my knowledge.

15      Q.   Has any version of the code been tested?

16      A.   Not to my knowledge.

17      Q.   What are the current -- strike that. During

18  2014 and 2015, what were Comenity's policies and

19  procedures as it would relate to a customer that says

20  don't call me during certain days or certain time

21  periods?

22          MR. GOLDEN:  Form.

23      A.   Unfortunately, we wouldn't be able to honor

24  specific times or dates.  So it would have to be either

25  -- we don't call them period or we continue to call



1  them.

2      Q.  Right.  And so that's my question.  When a

3  customer says, don't call me Monday through Friday from

4  9 to 5, during 2014 and 2015, would Comenity's practice

5  have been to stop calling that customer all together or

6  to continue calling?

7          MR. GOLDEN:  Form.

8      A.  You know, I don't know how or what the call

9  script will be-- would be right after if they have said

10  that to be honest.

11     Q.  So you're not aware of whether Comenity had a

12  rule or policy or practice in place for that situation

13  one way or the other?

14     A.  Correct.

15     Q.  It would be up to the discretion of the

16  collector or the agent who happens to be on the phone

17  with that customer at that time?

18         MR. GOLDEN:  Form.

19     A.  Yeah.  My understanding is that we do have a

20  way to now, I just don't know what it is.

21     Q.  Okay.

22     A.  How we would -- how we would respond to that

23  request.

24     Q.  Huh-uh.  Well, how do you know there is --

25  there is a way to handle it?



```
 1              MR. GOLDEN:  Form.
 2         Q.   You can answer the question.
 3         A.   Because I'm aware that those requests have to
 4    be made by customers.
 5         Q.   Okay.  More than once?
 6         A.   Yes.
 7         Q.   And how did you become aware that those
 8    requests have been made by customers?
 9         A.   I became aware of it -- through internal
10    dialog, other leaders and I'm aware that, you know,
11    through industry conferences about that being something
12    that was more and more coming up from customers and how
13    do you handle it.
14         Q.   So you were aware of that type of a customer's
15    instruction or request prior to it arising in this case
16    that we're here on today?
17              MR. GOLDEN:  Form.
18         A.   Yes, sir.
19         Q.   And as you sit here today, you?re not aware of
20    whether Comenity had a rule in place or a policy or
21    procedure in 2014 and 2015 as to how to handle those
22    requests?
23              MR. GOLDEN:  Form.
24         A.   Correct.
25         Q.   Do you know of any examples where a customer
```



1    made such requests and Comenity choose to continue

2    calling that customer?

3            MR. GOLDEN:  Form.

4        A.   I'm not aware of.

5        Q.   Do you know of any situations where a customer

6    made such a request, in other words, where they said

7    don't call me during certain days or certain times, and

8    Comenity honored the request?

9            MR. GOLDEN:  Form.

10       A.   I'm not aware.

11       Q.   If a customer were to instruct Comenity to not

12   call during certain days or certain times Comenity could

13   choose to have an agent manually call that customer

14   during the time periods when the customer indicated that

15   they would be willing to receive phone calls, correct?

16           MR. GOLDEN:  Form.

17       A.   I just want to make sure I understand the

18   question.  Is it -- go ahead.

19       Q.   I'm going to try to -- I'll rephrase it for

20   you.  So let's say we have a customer that says don't

21   call me Monday through Friday from 9 to 5, would you

22   agree with me that it would be possible for Comenity to

23   remove that customer's phone number from the database

24   from which automated dialer calls phone numbers to put

25   into queue for outbound -- outbound calls and when



1  Comenity wanted to call that customer to simply call

2  them manually outside of the restricted time period, 9

3  to 5 Monday through Friday using your example?

4       MR. GOLDEN: Form.

5       A.   It would be possible for to us to remove it

6  from our dialer and, then, we would need to development

7  to be able even manually make sure that they're only

8  called between their prospect -- their requested time

9  periods.

10      Q.   But would it be possible to do that?

11           MR. GOLDEN: Form.

12      A.   Yes, it would be possible.

13      Q.   I would like to play for you another recording

14  of a conversation between the Plaintiff and Comenity

15  that occurred on October 13th of 2014.

16           "MS. SCHWEITZER: Hello.

17           STELLA: Hi. Is this Emily?

18           MS. SCHWEITZER: Hi. Yeah.

19           STELLA: Thank you. For quality purposes this

20       call may be monitored and recorded. My name is

21       Stella. I'm calling from Victoria's Secret and

22       Comenity Bank, umm, regarding your account. It is

23       suggesting that you're two payments past due. I

24       was hoping to arrange a $35 payment today to bring

25       it current and (INAUDIBLE).



```
1           MS. SCHWEITZER:  Umm, unfortunately, I can't
2       afford to pay it right now, and, umm, if you guys
3       could not call me, like, in the morning and during
4       the work day because I'm working and I -- I can't
5       really be talking about these things while I'm at
6       work.  My phone been ringing off the hook.
7           STELLA:  I understand.  It's the call system.
8       When it's recorded two payments past due, it's the
9       computer that dials.  We can't stop the phone calls
10      like that -- It's not a (INAUDIBLE) call -- umm."
11      Q.   So let me ask you at this point a couple
12  questions about the conversation to the extent that we
13  played it thus far.  Would you agree with me that the
14  customer on that recorded phone call asked that Comenity
15  stop calling her during certain time periods?
16          MR. GOLDEN:  Form.
17      A.   Yes, sir.
18      Q.    Okay.  In that circumstance based on
19  Comenity's policies and procedures at that time which
20  was October 13th of 2014, what was the collector
21  supposed to do?
22          MR. GOLDEN:  Form.
23      A.   As it relates to, like, what, documentation of
24  the account or --
25      Q.   Or the documentation in the field, in the
```



1    phone call validity field that we talked before where

2    the collector has the option to leave it as a V or

3    change it A or a N?

4        A.   Right.  We -- I don't -- I'm not aware of a

5    procedure that update -- the ability to base on a

6    specific time request.

7        Q.   But, it was clear to you from that recording

8    that the customer was asking that she not be called

9    during certain time periods?

10           MR. GOLDEN:  Form.

11       A.   Yes, sir.

12       Q.   Thank you.  Now, then the collector said, if

13   you want, I can play it back for you, that there was

14   nothing she could do to stop the calls, because the

15   computer -- their computer automatically dials. Did you

16   understand what the collector was referring to?

17           MR. GOLDEN:  Form.

18       A.   No.  I wouldn't view that as a correct

19   statement.

20       Q.   Okay.  And what about the collector's

21   statement was incorrect?

22       A.   That there was no way to stop the calls.

23       Q.   Okay.  And why is that statement incorrect?

24       A.   Because we can through our validity codes to

25   stop the calls.



1    Q.    Right.  By entering an N or an A?

2    A.    Yes, sir.

3    Q.    Was the collector's statement correct to the

4    extent that he was explaining that when a customer's

5    account is delinquent that Comenity's systems are set up

6    for outbound calls to be initiated to customers whose

7    accounts are past due?

8    A.    Yes.

9    Q.    And is the trigger point for the outbound

10   phone calls two payments being past due --

11         MR. GOLDEN:  Form.

12   Q.    T-w-o?

13   A.    No, sir.

14   Q.    What -- is there a trigger in terms of the

15   time period for which a customer's account must be

16   delinquent before outbound calls using dialer would be

17   initiated?

18   A.    We will start calling a customer, you know, as

19   early as immediately after they're delinquent.  So after

20   we missed their first payment they're, you know, one day

21   delinquent, we could place a phone call.

22   Q.    Okay.  After a customer has made a request

23   like the one that you just heard the Plaintiff make in

24   the recording that we played from October 13th of 2014,

25   would it be necessary for Comenity, if they wanted to

1   **call that person here, the Plaintiff, again, in the**

2   **future using an automated dialer to read one of the pop**

3   **ups or scripts that we talked about earlier today to**

4   **contain the consent to call, again, using the automated**

5   **dialer in the future?**

6              MR. GOLDEN:   Form.

7       A.    You know, I just want to make sure I

8   understand your question.  If we -- is the question if

9   we reached her on the phone number that we dialed, and

10  we -- she tells us to stop calling, do we have to get

11  consent from her to continue dialing?

12      **Q.    Right.**

13             MR. GOLDEN:   Form.

14      A.    In the collection procedure, if it's not

15  already in the mobile field, they will read the script

16  of -- as they're moving it, they'll say, hey, this is

17  your mobile phone, do you give us consent to dial.  They

18  will read the script.

19      **Q.    So, if, at the time, that a customer like the**

20  **Plaintiff says, don't call me any more, and they only**

21  **have one phone number, and the phone number is in the**

22  **mobile field, and Comenity wants to call them again at**

23  **some point in the future using the automated dialer, it**

24  **would be Comenity's policy and practice that the agent**

25  **would have to obtain that consent by reading the script**



1  **that requests permission to call them using the dialer;**

2  **is that correct?**

3           MR. GOLDEN:  Form.

4      A.   Yes.  If we N out or A out -- put an N or an A

5  on that phone field, we will have to get the customer's

6  consent to dial it again via dialer.

7      **Q.   Correct.  And the N or the A is when the**

8  **customer asked that you don't call anymore?**

9           MR. GOLDEN:  Form.

10     A.   The N is when they asked not to call anymore,

11  and the A is when they say don't call me via dialer.

12     **Q.   And you agree, here, the customer said don't**

13  **call me any more?**

14          MR. GOLDEN:  Form.

15     A.   Yeah.  In the first example, yes.

16     **Q.   Okay.  And if Comenity -- strike that. Okay.**

17  **So let me play the balance of the recording for you.**

18          VIDEOGRAPHER:  Excuse me.  Before you do I

19      need to change the tape.  I don't know if I have

20      enough.

21          MR. WITES:  How much time do you now have?

22          VIDEOGRAPHER:  About two minutes.

23          MR. WITES:  How long does it take you to

24      change the tape?

25          VIDEOGRAPHER:  It's about a minute.



```
 1              MR. GOLDEN:  Form.
 2       Q.    In other words, does Comenity have a policy in
 3  place that in form or in substances always err on the
 4  side of caution when it relates to something that it
 5  might impact the Telephone Consumer Protection Act?
 6              MR. GOLDEN:  Form.
 7       A.    I'm not -- I'm not aware of any, you know,
 8  document or policy that would state that --
 9       Q.    Huh-uh.
10       A.    -- specifically.
11       Q.    You would agree with me, though, in the
12  context of the hypothetical that we talked about earlier
13  in this deposition where the Comenity customer says,
14  don't call me during certain days or certain time
15  periods, that if Comenity were to cease calling that
16  customer it would eliminate the possibility of violating
17  the Telephone Consumer Protection Act, correct?
18              MR. GOLDEN:  Form.
19       A.    Yes.
20       Q.    But if they continued to call that customer
21  using the automated dialer, which makes phones calls,
22  you said 7 days a week from 8:00 a.m. to 9:00 p.m. on
23  the weekends and 8:00 a.m. to I think you said 8:00 p.m.
24  on Saturday and 5:00 p.m. on Sunday, that it's possible
25  a violation could occur because the system could
```



877.291.3376
www.UCRinc.com

 1    **initiate a phone call during a time period where the**

 2    **customer said don't call me?**

 3            MR. GOLDEN:  Form.

 4        A.   Just to make sure I understand the question is

 5    if the customer had told us -- you -- not to call during

 6    a certain period of time, and we weren't able to honor

 7    that so probably could we potentially call them during

 8    those times?  Yes.

 9            MR. WITES:  Okay.  I don't have any other

10        questions.  Thank you.

11            MR. GOLDEN:  All right.  We'll read. Thanks

12            (Signature not waived)

13            (Deposition concluded at 12:17pm)

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   State of Ohio        :
                          :  SS:
 2   County of            :

 3

 4       I, DANIEL GERVAIS, do hereby certify that I have

 5   read the foregoing transcript of my deposition given on

 6   Friday, September 25, 2015; that together with the

 7   correction page attached hereto noting changes in form

 8   or substance, if any, it is true and correct.

 9

10   _____

11   DANIEL GERVAIS

12

13

14       I do hereby certify that the foregoing transcript

15   of the deposition of DANIEL GERVAIS was submitted to the

16   witness for reading and signing; that after he had

17   stated to the undersigned Notary Public that he had read

18   and examined his deposition, he signed the same in my

19   presence on the _____ day of _____, 2015.

20

21

22   _____

23   Notary Public

24

25   My commission expires _____, _____.
```



877.291.3376
www.UCRinc.com

```
 1                       CERTIFICATE

 2   State of Ohio       :
                         :    SS:
 3   County of Franklin  :

 4

 5        I, Ebony M. Reynolds, Professional Reporter and
     Notary Public in and for the State of Ohio, duly
 6   commissioned and qualified, certify that the within
     named DANIEL GERVAIS was by me duly sworn to testify to
 7   the whole truth in the cause aforesaid; that the
     testimony was taken down by me in stenotype in the
 8   presence of said witness, afterwards transcribed upon a
     computer; that the foregoing is a true and correct
 9   transcript of the testimony given by said witness taken
     at the time and place in the foregoing caption specified
10   and completed without adjournment.

11        I certify that I am not a relative, employee, or
     attorney of any of the parties hereto, or of any
12   attorney or counsel employed by the parties, or
     financially interested in the action.
13
          IN WITNESS WHEREOF, I have hereunto set my hand and
14   affixed my seal of office at Columbus, Ohio, on this 2nd
     day of October, 2015.
15

16

17

18   _____
     Ebony M. Reynolds,
19   Professional Reporter and
     Notary Public in and for the
20   State of Ohio.

21   My commission expires April 9, 2019.

22

23

24

25
```



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com